Dustin L. Collier (SBN 264766)
COLLIER LAW FIRM
1 Sansome Street, Ste. 3500
San Francisco, CA 94104
www.collierlawsf.com
T: (415) 767-0047
F: (415) 767-0037
dcollier@collierlawsf.com

Attorney for Plaintiff
MARISELA LOZANO

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| MARISELA LOZANO,<br><br>    Plaintiff,<br><br>  vs.<br><br>COUNTY OF SANTA CLARA, a public<br>entity, and DOES 1-50, inclusive,<br><br>    Defendants. | Case No.:  14-CV-02922<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>(1) Discrimination Based Upon Disability in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*;<br>(2) Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*;<br>(3) Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*;<br>(4) Harassment Based Upon Disability in Violation of Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e *et seq.*;<br>(5) Failure to Engage in Interactive Process in Violation of Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* |

Comes now Plaintiff MARISELA LOZANO, who complains and alleges as follows:

## PARTIES

1.  Plaintiff MARISELA LOZANO (hereafter "Plaintiff" or "Ms. Lozano") is, and at

all relevant times described herein was, an adult resident of the State of California.  Plaintiff first began her employment with Defendant COUNTY OF SANTA CLARA in or around April 2001 and remains in the employ of Defendant COUNTY OF SANTA CLARA to this day.

2.     At all times relevant herein, Plaintiff was an employee of Defendants COUNTY OF SANTA CLARA ("SANTA CLARA"), and DOES 1-50, inclusive.[1]  Defendant SANTA CLARA is a public entity and employer within the meaning of 42 U.S.C. § 12111(5)(A) and 29 C.F.R. § 1630.2(e)(1).

3.     Plaintiff is ignorant of the true names and capacities of the defendants sued herein as DOES 1-50, inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff will amend this Complaint to allege the true and correct names and capacities of these DOE defendant when ascertained.  Plaintiff is informed and believes, and thereon alleges, that said defendants, and each of them, are responsible in whole or in part for Plaintiff's damages as alleged herein.

## AGENCY

4.     Plaintiff is informed and believes, and thereon alleges, that Defendants, and each of them, were the agents, managers, directors, or employees of the other Defendants, or that said Defendants approved and/or ratified the conduct of the other Defendants, and that each of them was acting within the course and scope of such agency or employment, at all times relevant herein.

## AIDING AND ABETTING/CONSPIRACY

5.     Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiff, as alleged herein.  In taking action, as alleged herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoing complained of, each of the Defendants acted with an awareness of its/his/her primary wrongdoing and realized that its/his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and

---

[1] All defendants shall be hereinafter referred to collectively as "Defendants" or "Employer."

wrongdoing.  Defendants, and each of them, also knowingly and willfully conspired to do the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy.

## ALTER EGO

6.      There is a unity of interest amongst Defendants and each acts as the alter ego of the other.

## JURISDICTION

7.      Jurisdiction in the U.S. District Court of the Northern District of California is proper pursuant to 28 U.S.C. §1331, Federal Question Jurisdiction, in that this is an action arising under the Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. § 2000e *et seq.*) and the Americans with Disabilities Act ("ADA," 42 U.S.C. § 12101 *et seq.*).

8.      The amount in controversy exceeds $75,000 exclusive of interest and costs.

## INTRADISTRICT ASSIGNMENT

9.      Intradistrict assignment in the San Jose Division of the Northern District of California is proper as the action arises from conduct which primarily occurred in the county of Santa Clara, California, pursuant to Civil Local Rule 3-2(d).

## VENUE

10.     Venue is proper as Plaintiff's claims arose in the Northern District.

11.     Plaintiff has a disability and is thereby a member of a protected class under the ADA as well as Title VII, and is protected from discrimination and harassment, as well as retaliation, by her employer.

12.     At all times mentioned herein, Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000(e) *et seq.* was in full force and effect, and was binding upon Defendants.

13.     At all times mentioned herein, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* was in full force and effect, and was binding upon Defendants.

14.     Plaintiff is informed and believes and thereon alleges that Defendants COUNTY OF SANTA CLARA and/or DOES 1-50 constitute "employers" subject to suit under the Civil Rights Act in that Defendants are a governmental entity with 15 or more employees on each working day in each of 20 or more calendar weeks in the current or preceding calendar year and is doing business in the State of California. Defendants have never been a religious association or corporation organized not-for-profit.

## EXHAUSTION OF REMEDIES

15.     On or about January 28, 2013, and within the time provided by law, Plaintiff filed verified charges of discrimination, harassment and retaliation with the Equal Employment Opportunity Commission ("EEOC"). On or about March 17, 2014, Plaintiff requested a "Right to Sue" Notice from the EEOC. Because Defendant is a local government entity, the EEOC must first forward the request to the Department of Justice ("DOJ"). The DOJ then issues the right-to-sue notice. On or about March 20, 2014, the EEOC sent a letter to Plaintiff advising that the request had been so forwarded. The DOJ issued the right-to-sue notice on May 7, 2014.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

16.     Ms. Lozano began working for the County of Santa Clara on April 2, 2001 (with a different department than she is in presently). She began working for the Social Services Department in 2004. In 2009, she was promoted to Eligibility Worker II. As an Eligibility Worker II, Ms. Lozano worked independently analyzing and evaluating cases.

17.     On June 11, 2012 Ms. Lozano returned to work after being off on medical leave for a year. The leave was due to emotional distress caused by harassment, discrimination and retaliation against Ms. Lozano by a previous supervisor and manager in 2008 (conduct which resulted in a lawsuit filed in 2009). The building that the harassment took place in is located across the street from Ms. Lozano's current job location on Senter Road. After being off for a year, Ms. Lozano and her doctor both felt that it would be best for her to be reassigned to a different location. Again, they made this decision based on the severe emotional distress that the previous incidents had caused Ms. Lozano.

18.     Before returning to work on June 11, 2012, Ms. Lozano made a written request

for this reasonable accommodation on May 31, 2012, attaching letters from her doctors to support the request. Ms. Lozano's supervisor, Mereane Bailey-Murray (hereafter referred to as "Ms. Bailey-Murray"), informed Ms. Lozano a few days later that the accommodation request was denied because she purportedly "did not meet the requirements" for a reasonable accommodation. Ms. Bailey-Murray instead instructed Ms. Lozano to report to work on June 11, 2012 without restrictions.

19. Upon Ms. Lozano's return to work on June 11th, Ms. Bailey-Murray verbally reiterated that Ms. Lozano's request had been denied. No further effort was made to explain why the requested accommodation could not be provided, nor was any effort made to engage in an interactive process with Ms. Lozano to determine if other reasonable accommodations could be made.

20. Thus, Ms. Lozano felt she had no other avenues and attempted to make the best of her situation by concentrating on her work. Ms. Lozano wanted to forget about the previous situation that led to her lawsuit. She also felt somewhat secure in staying at that location, despite Ms. Bailey-Murray's refusal to accommodate her, because they had worked well together before Ms. Lozano went on medical leave in June 2011.

21. However, Ms. Bailey-Murray's attitude and demeanor towards Ms. Lozano changed dramatically from the way Ms. Bailey-Murray treated Ms. Lozano prior to the medical leave. Upon her return to work, Ms. Lozano realized an entirely new system had been implemented in the department, called "TMT." To this day, Ms. Lozano has never received formal training on this new system, and thus she was set up to fail before she ever resumed her duties.

22. At some point, Ms. Bailey-Murray told Ms. Lozano that she could receive training on the TMT system, but the training would be held in the building across the street. This was the same building that Ms. Lozano experienced so much anxiety in and which resulted in her doctors' request for accommodation in the first place (as well as the prior medical leave). Ms. Lozano felt that it was already bad enough that she was experiencing anxiety coming and going from work because the building across the street was a constant reminder of the events that led to

her medical conditions and lawsuit. When taken together with Ms. Bailey-Murray's denial of her request for accommodation to be moved from the two worksites, Ms. Lozano felt she had no choice but to decline the offer for training in that building to avoid relapsing into a state of extreme emotional distress.

23.     By October 2012, it became apparent to Ms. Lozano that she was being retaliated against and otherwise treated unfairly because of her prior lawsuit. Ms. Bailey-Murray had been micro-managing Ms. Lozano for a significant amount of time at that point. Prior to her medical leave, Ms. Lozano's work involved a great deal of independence from her supervisors. However, Ms. Bailey-Murray was now constantly criticizing Ms. Lozano's work, sending frequent emails picking apart and unduly monitoring Ms. Lozano's activities. It appeared from these behaviors that Ms. Bailey-Murray was in search of a justification to take adverse action against Ms. Lozano.

24.     Also in October 2012, Ms. Bailey-Murray forced Ms. Lozano to read the Civil Rights Compliance Review Bulletin in a meeting with all of Ms. Lozano's co-workers, ostensibly to shame her for her prior civil rights lawsuit and/or to mock the accommodation Ms. Lozano requested upon her return from leave. There were days where Ms. Lozano would be assigned over twice as many clients as her co-workers, making it virtually impossible for Ms. Lozano to adequately manage her caseload. Predictably, Ms. Bailey-Murray would reprimand Ms. Lozano for not doing enough on her TMT list in spite of this excessive workload. Ms. Bailey-Murray also began frequently accusing Ms. Lozano of being responsible for various issues regarding the tickets that had nothing to do with Ms. Lozano while simultaneously accusing her of having done things she did not do.

25.     During one of the numerous "counseling sessions" Ms. Bailey-Murray conducted with Ms. Lozano in October of 2012, Ms. Lozano pointed out that she was the only employee in the unit that Ms. Bailey-Murray had reprimanded for their TMT list. Ms. Lozano was well aware that others in her unit had more on their list than she did, sometimes exponentially more. Ms. Bailey-Murray responded by claiming that the Social Program Manager, The Tran ("Mr. Tran"), had instructed Ms. Bailey-Murray to reprimand Ms. Lozano for her caseload.

26.     During this same meeting, Ms. Lozano explained that the situation was reminding her of what had happened to her prior to her lawsuit.  Ms. Bailey-Murray told Ms. Lozano that she did not seem affected by the lawsuit because Ms. Lozano was "so well put together."  Ms. Lozano explained that she had been profoundly affected by the lawsuit and the conduct that gave rise to it, but that she was trying to make the best out of the situation.

27.     Ms. Lozano decided to e-mail Ms. Bailey-Murray the next morning to set up an appointment with her.  As Ms. Bailey-Murray claimed that Mr. Tran was the reason for the prior day's scolding over Ms. Lozano's caseload, Ms. Lozano suggested that Mr. Tran attend the meeting.  Ms. Bailey-Murray responded sarcastically, instructing Ms. Lozano to write down her issues for the meeting in a derogatory tone.

28.     At that point, Ms. Lozano simply wanted away from these two buildings, both of which reminded her of past trauma, and from the supervisor whom was apparently beginning to retaliate against her.  Ms. Lozano felt as though she was being singled-out.  She was extremely uncomfortable when she left work that day.  When she got home that night, Ms. Lozano read over the policy and procedures for requesting a reasonable accommodation from the County.  Ms. Lozano discovered that, pursuant to County policy, Ms. Bailey-Murray should have provided her with a written denial called a "Form B."  Furthermore, she learned that Ms. Bailey-Murray failed to have the Equal Opportunity Division review her request for accommodation before denying it.  In sum, Ms. Bailey-Murray diverged from established policy and procedure in handling the accommodation request.

29.     At that time, Ms. Lozano decided to refrain from any complaint about the unfair treatment to Mr. Tran.  She was afraid that Ms. Bailey-Murray's treatment would only get worse if she complained.  Instead, her newfound hope was that she may be transferred after all in light of Ms. Bailey-Murray's improper handling of her request.  Thus, Ms. Lozano requested the formal denial form, thinking she might finally be transferred away from the two locations that were causing her so much anxiety.

30.     Over the next few weeks, Ms. Bailey-Murray's unfair treatment only continued.  Ms. Lozano became deeply depressed and withdrawn.  She was already having panic attacks

from anxiety caused by her job, and now they were getting worse. She also began having severe sleeping problems. The sleep deprivation caused Ms. Lozano to show up late to work a few times, and she decided to request an alternative schedule to modify the 7:30 – 4:00 shift she often had to work to accommodate the deprivation.

31.     Ms. Bailey-Murray initially agreed that Ms. Lozano could change her hours to 8:30 – 5:00. Ms. Bailey-Murray also told her that it worked out better for the schedule because it meant that Ms. Bailey-Murray had coverage in the late afternoon when no one else wanted to work. Ms. Bailey-Murray's approval quickly gave way to Ms. Lozano being scheduled for shifts earlier than they had agreed to. Incredibly, Ms. Bailey-Murray would then scold Ms. Lozano for being late. It appears, from the foregoing, that the initial grant of this requested accommodation was a mere set-up and pretext for further retaliation.

32.     By the end of October, Ms. Lozano had begun coming down with illnesses more frequently than normal due to all of her anxiety. Often, after being off for an illness, Ms. Bailey-Murray would schedule Ms. Lozano on the calendar to perform the duties of more than one position simultaneously. If Ms. Lozano was already on calendar, she had to do both jobs. Ms. Bailey-Murray never treated any other employee in this manner. Indeed, Ms. Bailey-Murray would even allow other employees to exchange shifts, but Ms. Lozano was never allowed to do so.

33.     A few weeks into November, with no relief from Ms. Bailey-Murray's unfair treatment in sight, Ms. Lozano decided to write her a formal letter. Ms. Lozano pointed out Ms. Bailey-Murray's equivocation, initially granting and then refusing to honor the alternative schedule Ms. Lozano requested from her. Again, Ms. Lozano renewed her request for a formal denial form on her May 31st accommodation request regarding a transfer to a different location. She also pointed out Ms. Bailey-Murray's failure to follow the proper procedures regarding the request.

34.     The next day, nearly six months after her request for transfer as an accommodation and after four requests for the formal denial form, Ms. Lozano finally received the form from Ms. Bailey-Murray. Upon reading the denial letter, Ms. Lozano discovered,

among other things, that her request was denied for "not having sufficient documentation" (which was not the justification Ms. Bailey-Murray had expressed to her in their June 11th meeting).

35.     Ms. Lozano wrote another letter to Ms. Bailey-Murray expressing her disagreement with Ms. Bailey-Murray's report regarding the June 11th meeting and the denial of her accommodation request.  Ms. Lozano also contacted her Union representative and attempted to set up a meeting with Mr. Tran to discuss the matter.  That meeting would later be scheduled and then mysteriously cancelled, all while Ms. Lozano was on scheduled time off from work.

36.     A few days after receiving the formal denial, Ms. Lozano was scheduled for another morning shift.  She was late for work, again due to sleep deprivation.  Ms. Bailey-Murray called a meeting with her to talk "about the letters" and to scold Ms. Lozano's tardiness.  Ms. Lozano again pointed out that she had requested, and was told she would receive, an alternative schedule that allowed her to come in later to accommodate her sleep disturbances.

37.     Nevertheless, Ms. Bailey-Murray continued to schedule her for shifts that started earlier than agreed upon and refused to acknowledge the change in her position on this issue.  Ms. Bailey-Murray told Ms. Lozano to be there when she was scheduled, regardless of the time, and refused to engage in any further interactive process regarding the requested alternative schedule.  After the meeting, Ms. Lozano took it upon herself to set up a meeting with Mr. Tran, as her Union representative had not been able to do so up until that point.  Ms. Lozano also appealed the denial of her request for reasonable accommodation through the Santa Clara County Equal Opportunity Division on November 26, 2012.

38.     On December 5, 2012, Ms. Lozano finally received a meeting with Mr. Tran and Ms. Bailey-Murray.  Ms. Lozano provided Mr. Tran with a written synopsis of the things Ms. Bailey-Murray was doing.  After Ms. Lozano's explanation of everything, Mr. Tran gave Ms. Bailey-Murray a chance to address the issues.  As she was talking, Ms. Lozano got up to get something from her box to highlight a discrepancy in what Ms. Bailey-Murray was stating.  Ms. Bailey-Murray yelled, "SIT DOWN."  Ms. Lozano continued to reach for her highlighter, when Ms. Bailey-Murray again yelled, "I SAID, SIT DOWN."  Shortly after, Mr. Tran asked Ms.

Lozano to step out of the conference room for two minutes.  Ms. Lozano complied, and when she came back in, Ms. Bailey-Murray's attitude had changed dramatically.

39.     As they concluded the meeting, Mr. Tran said that he never instructed Ms. Bailey Murray to reprimand Ms. Lozano about her caseload, explaining that he did not run his department that way.  Furthermore, Mr. Tran stated that Ms. Lozano was permitted to come in at 8:30, even if she was on the calendar for a morning shift that was scheduled to start before 8:30.  Lastly, Mr. Tran noted that "the rest" of Ms. Lozano's complaints sounded like discrimination and he referred Ms. Lozano to the Equal Opportunity Office.  In sum, Mr. Tran personally observed that Ms. Bailey-Murray's behavior towards Ms. Lozano violated the County's equal opportunity policies and warranted a complaint regarding the same.

40.     On December 10th, 2012, Ms. Lozano met with Diane Von-Merta from the Santa Clara Equal Opportunity Division, where she was provided a denial form for the June 11th request for accommodation as well as the subsequent administrative appeal (which had also been summarily denied).  Notably, the date of this denial form differed from the "Form B" provided by Ms. Bailey-Murray.

41.     Notwithstanding the admonition from Mr. Tran, Ms. Bailey-Murray sustained her unfair treatment of Ms. Lozano and the anxiety that resulted began reaching an all-time high.  Apart from the previously discussed symptoms she was already experiencing, Ms. Lozano also began having stomach pains, lock-jaw, and eye twitches.  When she went to the dentist for her jaw pain, he explained that often stress can make a person grind their teeth.  She broke down in tears, immediately recognizing that the pain was caused by her work environment.

42.     Thus, when Ms. Lozano's previously requested vacation time rolled around, she was feeling extremely relieved for the break.  While on her vacation, Ms. Lozano decided to file a discrimination and retaliation charge with the Equal Employment Opportunity Commission ("EEOC") on December 27, 2012.[2]  On January 8, 2013, after a few weeks off, Ms. Lozano returned to work.

---

[2] The charge was officially processed by the EEOC later on January 28th, 2013.

43.     However, upon reviewing her scoreboard at work, she discovered that she was inexplicably behind for reasons which were unclear.  The usual practice of the department had been to avoid assigning new tickets to employees while they were on vacation (especially employees whom had given advance notice like Ms. Lozano).  Meanwhile, Ms. Lozano had been assigned several tickets during her absence.  Ms. Lozano wrote to Ms. Bailey-Murray that day about the situation, noting that her ticket number at that point had reached triple digits.  Ms. Lozano also explained that she would no longer be volunteering for the group-interview as a result of the overwhelming amount of work she was assigned (in addition to the fact that none of her co-workers ever volunteered).

44.     The next day, on January 9th, 2013, Ms. Bailey-Murray had Ms. Lozano read the "Reasonable Accommodation Bulletin" in front of her entire unit, ostensibly to shame and humiliate her.  Ms. Lozano was horrified and immediately felt that this was yet another form of Ms. Bailey-Murray's unfair treatment towards her a mere two days after her return from vacation.  Later in the day, Ms. Bailey-Murray emailed Ms. Lozano to request that she continue to volunteer for the group-interview.  Ms. Lozano was far too behind with all of the backed-up tickets she was assigned while on vacation, so she declined.  She did explain, however, that she would be happy to help out if Ms. Bailey-Murray would rotate their unit for the volunteer job.

45.     From that moment on, Ms. Bailey-Murray put Ms. Lozano on the calendar more than any other employee every day, often on double shifts for positions that were not conducive to Ms. Lozano's efforts to catch up on her tickets.  Far too many times, Ms. Lozano was unable to take her lunch and rest breaks on the days Ms. Bailey-Murray scheduled her for double shifts due to the increased and unbearable workload/schedule.

46.     At the end of the day on January 15, 2012, Ms. Lozano noticed a sign outside of Ms. Bailey-Murray's office that read, "No Phones.  Doc Processing Day."  When she asked Ms. Bailey-Murray what the board meant, Ms. Bailey-Murray explained that it was for employees to catch up on work.  That day, Ms. Lozano was scheduled for a double shift (as had become usual) in the role of "Officer of the Day."  This meant she had little (if any) time to catch up on her work that day.  Ms. Lozano explained her schedule that day to Ms. Bailey-Murray, and said that

she really could have used the day to work on her case load like all of the other employees were being allowed to do.  Ms. Bailey-Murray said that she would give Ms. Lozano a doc processing day the following day.

47.     However, Ms. Lozano never received her document processing day from Ms. Bailey-Murray.  By this time, Ms. Lozano was feeling more exhausted, depressed, frustrated and helpless than ever.  Ms. Lozano called in sick on January 18, 2013 with the intention to return back to work.  However, after a few days of condition failing to improve, she sought medical treatment on January 24, 2013.  At that time, her doctor decided she should go on medical leave once again.

48.     However, even while on medical leave, Ms. Bailey-Murray continued to treat Ms. Lozano unfairly.  During this time, Ms. Bailey-Murray did not provide Ms. Lozano with the Workers Compensation Claim form she requested for an entire week notwithstanding the legal mandate to provide it within twenty-four hours of notice to the employer of a work-related injury.  Instead, the form was provided only after Ms. Lozano wrote to Bich Do from Human Resources ("HR") to complain about this issue.

49.     On March 18, 2013, still during her leave of absence, Ms. Lozano filed a formal complaint with the Equal Opportunity Division against her supervisor.

50.     Also during the leave of absence, Ms. Lozano's medical coverage was inexplicably cut off.  When Ms. Lozano inquired with Valley Health Plan about the issue, they explained that her medical coverage was cancelled by the employer on February 2, 2013.  Notably, this "cancellation" occurred within days of her employer receiving notice of the charges Ms. Lozano had filed with the EEOC.

51.     Ms. Lozano contacted Valley Health and they had no explanation for why coverage had been cancelled.  Per their advice, Ms. Lozano contacted HR, whom did not even show Ms. Lozano as being on medical leave.  HR later discovered that Ms. Bailey-Murray had failed to provide three (3) pay sheets for Ms. Lozano's file in February, making it appear as though Ms. Lozano no longer worked there.  They instructed Ms. Lozano to have Ms. Bailey-Murray submit the missing pay sheets.  Ms. Lozano sent two e-mails for this purpose, but Ms.

Bailey-Murray never responded to either of them.

52.     Ms. Lozano regained medical coverage on April 4, 2013 in spite of Ms. Bailey-Murray's refusal to process the paperwork.  However, her medical coverage was disrupted again shortly thereafter (potentially due to further interference by Ms. Bailey-Murray).  Ms. Lozano was eventually forced to find a doctor outside of the health plan due to these difficulties, stress she neither needed nor deserved while attempting to recuperate from the health conditions caused by her employer's earlier acts of retaliation.

53.     Ms. Lozano wanted to get back to work on April 3, 2013 and put in a second doctor's note requesting accommodation once more.  She notified Ms. Bailey-Murray that she would be turning in the documents and requested that they be forwarded to Mr. Tran.  Mr. Tran never contacted Ms. Lozano in response, but Ms. Bailey-Murray did (indicating the documents may have been withheld from Mr. Tran altogether).  When she called Ms. Lozano on May 1, 2013, Ms. Bailey-Murray claimed that the medical documentation Ms. Lozano had provided was not sufficient to support her request for accommodation.

54.     Ms. Lozano's doctor revised the letter May 12, 2013 in response to Ms. Bailey-Murray's comments, but again Ms. Bailey-Murray claimed that the letter did not state a work restriction and denied her request.  Ms. Bailey-Murray followed up by sending two formal denials to Ms. Lozano.  No further effort was made to accommodate Ms. Lozano, to explain what hardship (if any) the request imposed, or to engage in a good-faith interactive process to determine if accommodations could be made.

55.     In the face of the aforementioned events, Ms. Lozano decided to file yet another discrimination and retaliation charge with the EEOC on May 29, 2013[3].

56.     Later, Patricia Carter from the Social Services Equal Opportunity Division set up a meeting with Ms. Lozano for July 1, 2013, in order to discuss the accommodation request.  Ms. Carter claimed that the request did not state a work restriction.  Ms. Lozano explained that her doctor revised the letter after receiving the May 2, 2013 denial and her doctor said she did not know how to be any clearer in the letter.  Ms. Lozano told Ms. Carter that they should ask her

---

[3] The EEOC charge was officially received, and the employer was notified, on June 7, 2013.

doctor, as per their policy, if any further information was needed after her request was submitted. Ms. Carter agreed, and said that Ms. Lozano's doctor would have 30 days to provide the letter. Otherwise, the request would be denied.

57.    However, at that point, Ms. Lozano was no longer seeing her doctor because her medical coverage had been terminated.  Ms. Lozano hoped that her doctor would respond to the letter anyways, and luckily she did.  Once again, her doctor reiterated the importance for Ms. Lozano to be moved from the physical location that was causing her medical condition.  The doctor stated that the mere thought of going in the building causes great emotional distress and torment for Ms. Lozano.  Ultimately, Ms. Lozano's request was again denied, stating that her medical documentation does not support a work restriction.  The denial also indicated that Ms. Lozano's doctor said she could return to work unrestricted, when any reasonable reading of the letter reveals the cruelty and callous disregard one must have to read the doctor's letter that way.

58.    Ms. Lozano's new doctor has since placed her on medical leave until September 1, 2015, the only remedy she has in the face of her employer's persistent refusal to accommodate her medical condition.  To this day, she has never been contacted by anyone from the office of Karen Ulrich, Manager of the Equal Opportunity Division, for an interview concerning her claim.  She still suffers from post-traumatic stress disorder, depression, and sleep deprivation arising from the foregoing unlawful conduct.  Ms. Lozano has been to numerous medical doctors and psychologists as a direct result of her toxic work environment and the pain it engenders.

59.    On March 17, 2014, Ms. Lozano requested a Right-to-Sue notice on her pending EEOC charges.  On March 20, 2014, the EEOC sent a letter to Defendant SANTA CLARA notifying them that Ms. Lozano had made this request.

60.    Two weeks later, on April 4, 2014, Ms. Bailey-Murray wrote a letter to Ms. Lozano denying her request for a leave of absence and threatening to terminate her if she did not submit further documentation in support of her accommodation request within ten days.  This letter incorrectly stated that Ms. Lozano had been on leave for two years longer than she actually had and it was mailed to an address Ms. Bailey-Murray knew to be incorrect.  Moreover, Ms. Lozano had already been out on the same leave of absence for over a year without Ms. Bailey-

Murray denying this requested accommodation. Thus, it appears that the decision to send this letter was made in direct response to the March 20th letter from the EEOC.

61. On April 29, 2014, Ms. Lozano submitted another request for reasonable accommodation on the County's official form, again seeking a transfer to a different facility to avoid the trauma she experiences from being at the Senter road location. On May 13, 2014, her doctor submitted yet another letter in support of the accommodation request, contending that Ms. Lozano needed a transfer as an accommodation and that she should begin on a part-time schedule (working her way back to full-time gradually to minimize the emotional distress involved in doing so). Finally, the doctor's letter advised that Ms. Lozano should be assigned a new supervisor whom does not harass her or otherwise exacerbate her medical condition. With these accommodations, the doctor advised, Ms. Lozano would be able to perform the essential functions of her position without incident.

## FIRST CAUSE OF ACTION:

### DISCRIMINATION BASED ON DISABILITY
### IN VIOLATION OF THE ADA AND TITLE VII
### (42 U.S.C. § 12101 *et seq.*; 42 U.S.C. § 2000e *et seq.*)
### (Against all Defendants)

62. By this reference, Plaintiff hereby incorporates each and every paragraph set forth above as though fully set forth at this place.

63. Ms. Lozano is a qualifying individual within the meaning of the ADA because she is an individual with a disability who, with or without reasonable accommodation, could perform the essential functions of the employment position that she holds. She also satisfies the requisite skill, experience, education, and other job-related requirements of the employment position, as demonstrated by her many years of satisfactory employment in that position prior to the foregoing events. Ms. Lozano has depression, post-traumatic stress disorder, and a sleep disorder, all of which substantially limit her in one or more major life activities including but not limited to caring for herself, performing manual tasks, sleeping, breathing, learning, interacting with others, and working.

64.     Plaintiff is informed and believes, and thereon alleges, that she was discriminated against in the terms and conditions of her employment, as outlined above, on the basis of her disability as set forth herein, in violation of the ADA.  In particular, Ms. Lozano was given adverse work assignments and schedules, held to disciplinary and performance standards no other employee was subjected to, denied accommodations for her disability, involuntarily forced onto an unpaid leave of absence,[4] threatened her with termination, and otherwise took employment actions which materially and adversely affected the terms and conditions of her employment.

65.     Ms. Lozano's qualifying disability was a motivating factor for the Defendants' decision to engage in the aforementioned adverse employment actions.

66.     Plaintiff is informed and believes, and thereon alleges, that Defendants and/or DOEs 1-50 willfully and/or with reckless indifference, violated the ADA and discriminated against Plaintiff as outlined above, on the basis of her disability.  Such discrimination has resulted in damage and injury to Plaintiff as alleged herein.

67.     As a direct and proximate result of Defendants' and/or DOEs'1-50 unlawful conduct, Plaintiff has suffered special damages including but not limited to past and future loss of income, benefits, and other damages to be proven at time of trial.

68.     As a direct and proximate result of Defendant's and/or Does 1-50 unlawful conduct,  Plaintiff has suffered general damages including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses to be proven at the time of trial.

69.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of Defendants and/or DOEs 1-50 who were acting at all times relevant to this Complaint within the scope and course of their employment.  Defendants and/or DOEs 1-50 are, therefore, liable for the conduct of said agents and employees under the Doctrine of Strict Liability.

---

[4] Although Ms. Lozano requested the leave of absence, this was only necessary because of the Defendants' earlier refusal to accommodate her with a transfer or scheduling adjustment.

70.     As a result of the conduct of Defendants and/or DOEs 1-50, Plaintiff was forced to retain an attorney in order to protect her rights.  Accordingly, Plaintiff seeks the reasonable attorneys' fees and costs incurred in this litigation in an amount according to proof at trial pursuant to the ADA and Title VII.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

### RETALIATION IN VIOLATION OF THE ADA AND TITLE VII

**(42 U.S.C. §§ 12101 *et seq.*; 42 U.S.C. § 2000e *et seq.*)**

**(Against all Defendants)**

71.     By this reference, Plaintiff hereby incorporates each and every paragraph set forth above as though fully set forth at this place.

72.     Under 42 U.S.C. section 12101 *et seq.*, it is unlawful for a person or entity to discriminate against any individual because that individual has opposed any act or practice that he or she reasonably believes to be unlawful under the ADA or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA.  Throughout the time period covered by this dispute, Plaintiff made complaints of disability discrimination to the Defendants.  Similarly, Plaintiff's filing of charges with the EEOC, participation in the EEOC investigation, and request for a Right-to-Sue notice all constituted protected activity within the meaning of the ADA.

73.     Additionally, Plaintiff's earlier lawsuit involved complaints of gender discrimination, sexual harassment, retaliation and other practices made unlawful by Title VII.  As a result, she is also protected from retaliation by 42 U.S.C. section 2000e-3(a).  Her earlier litigation, the complaints of unlawful activity surrounding that litigation, her more recent complaints of disability discrimination, and her more recent EEOC activity all constitute protected activities under this section as well.

74.     Plaintiff is informed and believes, and thereon alleges, that she was discriminated against in the terms and conditions of her employment, as outlined above, because of the aforementioned protected activities, in violation of the ADA and Title VII.  In particular, Ms.

Lozano was given adverse work assignments and schedules, held to disciplinary and performance standards no other employee was subjected to, denied accommodations for her disability, involuntarily forced onto an unpaid leave of absence, threatened her with termination, and otherwise took employment actions which materially and adversely affected the terms and conditions of her employment.

75.     Ms. Lozano's protected activities formed a motivating factor for the Defendants' decision to engage in the aforementioned adverse employment actions.

76.     Plaintiff is informed and believes, and thereon alleges, that Defendants and/or DOEs 1-50 willfully and/or with reckless indifference, violated the ADA/Title VII and retaliated against Plaintiff as outlined above, on the basis of her protected activities.  Such retaliation has resulted in damage and injury to Plaintiff as alleged herein.

77.     As a direct and proximate result of Defendants' and/or DOEs'1-50 unlawful conduct, Plaintiff has suffered special damages including but not limited to past and future loss of income, benefits, and other damages to be proven at time of trial.

78.     As a direct and proximate result of Defendant's and/or DOEs 1-50 unlawful conduct,  Plaintiff has suffered general damages including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses to be proven at the time of trial.

79.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of Defendants and/or DOEs 1-50 who were acting at all times relevant to this Complaint within the scope and course of their employment.  Defendants and/or DOEs 1-50 are, therefore, liable for the conduct of said agents and employees under the Doctrine of Strict Liability.

80.     As a result of the conduct of Defendants and/or DOEs 1-50, Plaintiff was forced to retain an attorney in order to protect her rights.  Accordingly, Plaintiff seeks the reasonable attorneys' fees and costs incurred in this litigation in an amount according to proof at trial pursuant to the ADA and Title VII.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**THIRD CAUSE OF ACTION**

**FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA**

**(42 U.S.C. § 12101 *et seq.*)**

**(Against all Defendants)**

81.     By this reference, Plaintiff hereby incorporates each and every paragraph set forth above as though fully set forth at this place.

82.     Plaintiff requested reasonable accommodations for her disability, including a transfer, reassignment to a new supervisor, a modified work schedule, and a leave of absence. Additionally, the Defendants knew or had reason to know that Plaintiff had a disability and knew or had reason to know that Plaintiff was experiencing workplace problems because of the disability.

83.     The Defendants could have provided reasonable accommodations for the Plaintiff, accommodations which would have enabled the Plaintiff to perform the essential functions of her job, including but not limited to transferring her to another facility, assigning her to a new supervisor, modifying her schedule to accommodate her sleep deprivation, allowing her to work a part-time schedule, altering her caseload or workflow (such as reducing it to the same caseload worked by her coworkers), and/or permitting her additional time to complete that caseload. Defendants, nevertheless, refused to provide this or any other reasonable accommodation for Plaintiff's disability.

84.     As a direct and proximate result of Defendants' and/or DOEs1-50 unlawful conduct, Plaintiff has suffered special damages including but not limited to past and future loss of income, benefits, and other damages to be proven at time of trial.

85.     As a direct and proximate result of Defendant's and/or DOEs 1-50 unlawful conduct, Plaintiff has suffered general damages including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses to be proven at the time of trial.

86.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of Defendants and/or DOEs 1-50 who were acting at all

times relevant to this Complaint within the scope and course of their employment. Defendants and/or DOEs 1-50 are, therefore, liable for the conduct of said agents and employees under the Doctrine of Strict Liability.

87.     As a result of the conduct of Defendants and/or DOEs 1-50, Plaintiff was forced to retain an attorney in order to protect her rights.  Accordingly, Plaintiff seeks the reasonable attorneys' fees and costs incurred in this litigation in an amount according to proof at trial pursuant to the ADA and Title VII.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## FOURTH CAUSE OF ACTION

### HARASSMENT IN VIOLATION OF ADA AND TITLE VII

**(42 U.S.C. § 12101 *et seq.*; 42 U.S.C. § 2000e *et seq.*)**

**(Against all Defendants)**

88.     By this reference, Plaintiff hereby incorporates each and every paragraph set forth above as though fully set forth at this place.

88.     Plaintiff was subjected to unwanted and harassing conduct in the form of slurs, insults, jokes, or other verbal comments or intimidation of a discriminatory nature on account of Plaintiff's disability.

89.     The harassing conduct based on Plaintiff's disability was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and to create an abusive or hostile work environment.  Much of the harassing conduct was committed by Plaintiff's immediate supervisors.  Additionally, some of the harassing conduct was committed by Plaintiff's non-immediate supervisors or coworkers. Defendants knew or should have known of the harassing conduct, and Defendants failed to take prompt, effective remedial action reasonably calculated to end the harassment.

90.     Plaintiff perceived the working environment to be hostile or abuse.

91.     A reasonable person with a qualifying disability in the plaintiff's circumstances would consider the working environment to be abusive or hostile.

92.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered special damages including but not limited to past and future loss of income, benefits, and other damages to be proven at time of trial.

93.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered general damages including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses to be proven at the time of trial.

94.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of Defendants and/or DOEs 1-50 who were acting at all times relevant to this Complaint within the scope and course of their employment.  Defendants and/or DOEs 1-50 are, therefore, liable for the conduct of said agents and employees under the Doctrine of Strict Liability.

95.     As a result of the conduct of Defendants and/or DOEs 1-50, Plaintiff was forced to retain an attorney in order to protect her rights.  Accordingly, Plaintiff seeks the reasonable attorneys' fees and costs incurred in this litigation in an amount according to proof at trial pursuant to the ADA and Title VII.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## FIFTH CAUSE OF ACTION

### FAILURE TO ENGAGE IN INTERACTIVE PROCESS IN VIOLATION OF ADA

**(42 U.S.C. § 12101 *et seq.*)**

**(Against all Defendants)**

96.     By this reference, Plaintiff hereby incorporates each and every paragraph set forth above as though fully set forth at this place.

97.     The ADA at section 12112(b)(5)(A) and 29 C.F.R. section 1630.9 & Pt. 1630, App. section 1630.9 provide that it is unlawful for an employer to fail to engage in a timely, good faith interactive process with an employee to determine effective reasonable accommodations, if any, which may be made for the employee to permit them to perform the essential functions of their position.

98.     Defendants failed to engage in a timely, good faith interactive process with Plaintiff to determine whether any of the accommodations she proposed could be made, to discuss what hardship if any was imposed by the requested accommodations, to recommend alternative accommodations, or to otherwise determine whether any reasonable accommodations were possible.  Instead, Defendants flatly refused to accommodate the Plaintiff and forced her onto an unpaid leave of absence, the economic equivalent of being terminated from employment.

99.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered special damages including but not limited to past and future loss of income, benefits, and other damages to be proven at time of trial.

100.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered general damages including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses to be proven at the time of trial.

101.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of Defendants and/or DOEs 1-50 who were acting at all times relevant to this Complaint within the scope and course of their employment.  Defendants and/or DOEs 1-50 are, therefore, liable for the conduct of said agents and employees under the Doctrine of Strict Liability.

102.     As a result of the conduct of Defendants and/or DOEs 1-50, Plaintiff was forced to retain an attorney in order to protect her rights.  Accordingly, Plaintiff seeks the reasonable attorneys' fees and costs incurred in this litigation in an amount according to proof at trial pursuant to the ADA and Title VII.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against the Defendants as follows:

1.     For compensatory damages against all Defendants in an amount according to proof, up to and including $3,000,000.00;

2.     For declaratory relief against all Defendants;

3.    For injunctive relief against all Defendants;

4.    For statutory attorneys' fees and costs of suit against all Defendants;

5.    For such other and further relief as is just and proper against all Defendants.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for each and every claim for which she has a right thereto.


Date:  June 27, 2014                    Respectfully Submitted,


                                          /s/ Dustin L. Collier
                                        Dustin L. Collier
                                        Attorney for Plaintiff
                                        MARISELA LOZANO